## No. 9917.

SUCCESSION OF MRS. MINERVA SPARROW, ON OPPOSITION TO PROVISIONAL ACCOUNTS OF ADMINISTRATION AND TO TABLEAU OF DEBTS.

JOHN W. DECKER, GUARDIAN, ET AL. VS. CHRISTOPHER CHAFFE, JR., ADMINISTRATOR.

[Consolidated.]

A commission merchant holding funds as the proceeds of products owned by a deceased person, holds the same in trust, and cannot legally pay them to any other but the duly qualified representative of the succession.

A payment to any other will not discharge him from his legal responsibility therefor.

The opposition of one of these heirs to an account of administration is sufficient to submit the whole account to judicial test, although the other two heirs may have approved of the same. In such a case parties in interest, whose claims may be rejected, have their recourse against the heirs who have recognized their claim in due course of administration. It is no longer an open question in our jurisprudence that an executor or administrator cannot, at the risk of the succession, carry on planting operations and contract, in so doing, debts so as to bind the estate.

In such cases the administrator, who has not tried to lease the succession property, will be held liable for the rental value of the same.

Errors of judgment, not amounting to malfeasance, are not sufficient causes for the removal of an administrator, or to authorize one of his securities to withdraw from his bond.

APPEAL from the Eighth District Court, Parish of East Carroll. *Delony*, J.

*Chas. S. Wyly, F. F. Montgomery* and *W. G. Wyly* for Opponents and Appellants.

*J. W. Montgomery, C. J. & J. S. Boatner* and *D. B. H. Chaffe* contra.

The opinion of the Court was delivered by

POCHÉ, J. This litigation involves the discussion of a first and of

a second provisional accounts of administration, and of a tableau of debts, of the succession of Mrs. Minerva Sparrow, presented by Chris. Chaffe, Jr., the present administrator of said succession, and it is predicated on the following facts and judicial proceedings:

At her death in December, 1879, Mrs. Minerva Sparrow, who was separate in property by judgment from her surviving husband, Edward Sparrow, left an estate consisting of three cotton plantations, of some town lots, and of movable effects attached as appurtenances to the plantations, amounting altogether, as shown by the inventory, to $68,421 25.

· She died intestate, and left as heirs at law two daughters, of age, Mrs. Kate Foster and Mrs. Fanny Ashbridge, and two orphan grand-daughters, Mary and Kate Decker, issue of a predeceased daughter, Anna Sparrow, wife of John N. Decker.

Having been abandoned by their father shortly after their mother's death and soon after their birth, the orphan twin sisters, Mary and Kate Decker, were taken in charge by their grandparents, Edward Sparrow being appointed as their tutor in August, 1881. In July, 1885, their father appeared and qualified as natural tutor, but he died shortly thereafter, and now they are represented in these proceedings by a *tutor ad hoc*, Chas. S. Wyly, Esq.

In July, 1880, seven months after the death of his wife, Edward Sparrow was qualified as administrator of her succession, the property of which, however, had been in his possession and under his control from the time of her death.

Beginning under his precarious possession and continuing under his administration, Edward Sparrow cultivated on a large scale the plantations belonging to the succession, and extended his operations to other and adjoining lands, which he rented, as well as to a plantation store from which he furnished supplies to the large force of laborers which he employed in his planting enterprise.

He died in July, 1883, without ever presenting an account of his administration.

He was succeeded as administrator by Chris. Chaffe, Jr., a resident of the city of New Orleans, a member of the commercial firm of John Chaffe & Sons, cotton factors, with whom the deceased administrator had carried on all the financial operations of the succession, and who claimed to be creditors of the same in a large amount, as advances for the cultivation of the succession plantations, the correctness of whose account had been acknowledged in writing by Edward Sparrow a short time previous to his death. The new administrator, who was

qualified on the 4th of August, 1883, continued to cultivate the plantations precisely as his predecessor had done, including the employment of the firm of John Chaffe & Sons as his commercial merchants, but he abandoned the plantation store which had been kept by the previous administrator.

On the 24th of April, 1885, he presented his first provisional account of administration, covering the operations of the years 1883 and 1884, and showing to the credit side of the succession $54,590 68 and debits amounting to $45,265 50, striking as balance of assets in his hands the sum of $9325 18. On the same day he filed a tableau of debts due by the succession amounting to $40,719 73.

That statement included a debt of $27,466 68 due to the firm of John Chaffe & Sons, which had accrued during the administration of Edward Sparrow, and an additional indebtedness composed of certain notes of over $4000, and others aggregating $7051 32 due by Mrs. Minerva Sparrow to said firm.

The account and the tableau were both opposed by Mrs. Fanny Ashbridge, one of the heirs of age. Before the trial of the opposition the administrator presented a second provisional account, which was filed in April, 1886, in which he covered portions of the years 1884 and of 1885, and in which he was made a creditor of the succession in the sum of $1682 49, exclusive of his commission as administrator.

That account was likewise opposed by Mrs. Ashbridge, who was joined by John N. Decker, guardian and natural tutor, and subsequently by Chas. S. Wyly, the tutor ad hoc of the minors, Mary and Kate Decker.

Engrafted on these oppositions is an action brought by them in July, 1885, for the destitution of Chris. Chaffe as administrator, on the ground of various acts of alleged malfeasance. This suit was consolidated with the main action involving the various accounts of administration. While the record shows that all the items of both accounts and of the tableau of debts were opposed, it appears therefrom that the main ground of attack is the alleged want of legal authority of either of the two administrators to have undertaken large agricultural ventures with the plantations belonging to, and at the risk and expense of, the succession. Alleging that the cotton crop of 1879, left by Mrs. Minerva Sparrow, and shipped to, and sold by, John Chaffe & Sons, was more than sufficient to extinguish the debt which she owed to that firm, and that, therefore, the succession owed no debts, opponents seek to hold the administrator, Chaffe, judicially

responsible for the rental value of the plantations belonging to the succession.

Under an order rendered by the court on an exception of accountant, opponents, under protest, elected to claim the rents of the plantations, instead of discussing the accounts of the expenses of raising, and of the proceeds of, the crops. The district judge maintained both accounts and the tableau of debts, with some slight amendments. He dismissed the demand for the removal of the administrator, as well as the rule to compel him to furnish a new bond, but he enforced the demand of Mrs. Ashbridge to be discharged as one of the sureties on the administrator's bond. From that judgment the opponents and the accountant have both appealed.

I.

From balance sheets rendered by the firm of John Chaffe & Sons, in February, 1880, it appears that on account of cotton sold by them on account of Mrs. Sparrow, she had a balance to her credit in their hands amounting to $11,451 61, and that they held her notes aggregating $11,051 32. Instead of compensating their claim against the succession by the proceeds of the cotton received for its account, they erroneously attempted to charge against the succession and to the proceeds of its cotton a debt due to them by A. M. Ashbridge, the husband of one of the heirs, and also a personal debt which Edward Sparrow owed to them.

As the succession was then unrepresented, and as neither of the debts could, under any circumstances, be charged to Mrs. Sparrow, the settlement was entirely unauthorized, and was absolutely null.

The authority set up by John Chaffe & Sons, as coming from Ed. Sparrow, is of no avail. He was not yet the administrator, and he was powerless to legally bind the succession.

In law John Chaffe & Sons must be held to have never parted with that fund, and in law it must be attributed to the indebtedness of Mrs. Sparrow to the firm.

Either their notes have been compensated by the proceeds, or the fund is yet in their hands. The most equitable horn of the dilemma towards them is to compensate the one by the other, and thus avoid a discussion of the plea of prescription which opponents had set up against these notes due by Mrs. Sparrow. The amount of these notes must, therefore, be stricken out of the tableau of debts due by the succession, as contended for by opponents, by which operation a debit of $400 29 will stand against John Chaffe & Sons as the difference between the proceeds of the succession cotton and the amount of the notes due by Mrs. Sparrow.

## II.

As all the other items contained in the tableau of debts originate from the planting operations of both of the administrators indiscriminately, their validity turns upon the right of either or both of the said administrators to cultivate the plantations for the benefit, and at the expense, of the succession, and that discussion presents the crucial question in the case.

But an incidental question, which affords the most harrassing complication in the whole controversy, must first be disposed of, and that is the authority which the administrator holds up from the two heirs of age, conferring to him the right to cultivate the plantations. The record contains two instruments executed by Mrs. Foster and Mrs. Ashbridge, who therein recognize the indebtedness of the succession of Chaffe & Sons, resulting from their father's planting operations as administrator of their mother's succession, and other evidence added thereto might justify the conclusion that these two heirs had concurred in their father's plan for a large agricultural enterprise. But they were not the only heirs of the succession, and surely their consent cannot be invoked as binding the whole succession. Without discussing now the ultimate legal consequences which may result to them from the acts in question, it is both rational and legal to hold that, as the minor heirs could not be bound otherwise than by operation of judicial proceedings regularly carried on in their behalf, the consent of the heirs of age cannot bind the succession as a legal entity.

It is elementary in our practice that all parties who are cited to show cause why an account of administration should not be approved and homologated, are defendants, and that an opposition is an answer. Succession of Romero, 28 Ann. 607. It follows, therefore, that the pleadings of one party in interest cannot be binding on another.

In this case the minor heirs, through their tutor *ad hoc*, fully authorized to represent them, have filed an answer which contests the legality of the debts charged to the succession, and their right of urging that defense cannot be impaired by the petition of intervention of Mrs. Foster, who alleges the regularity of all the proceedings which are assailed by her co-heirs. No more can their position be affected by any acts or contracts of either or of both of the heirs of age, by which they might eventually be held liable for their virile or respective shares in the debts which are resisted in these oppositions. The question which their pleadings present is one of law and of right which reaches the whole succession, and it cannot be divided or parceled into fragments for the purpose of discussion.

We shall, therefore, treat the question as affecting the succession as an entirety, irrespective of the special attitude of any particular heir in the premises.

After arguing that there was no necessity for the sale of any of the immovable property of the succession, under the provisions of Articles 1163, 1164 and 1165 of the Civil Code, counsel for the accountant contend that it then became the bounden duty of the administrator to cultivate the plantations, and that, therefore, the heirs are bound for the debts which he may have contracted in furtherance of that duty.

His main reliance is on Article 1168 of the Code, which reads as follows:

"If it is not necessary to sell the property engaged in agriculture, belonging to the succession, in order to pay the debts, it must be preserved and administered by the curator for the account of the absent heirs for one year after his appointment."

But nothing in the record even suggests the slightest pretence that the cultivation of these plantations was undertaken under the authority of that article.

It is in full proof throughout the record that the object of Edward Sparrow was far from the idea of preserving and administering the property on account of the heirs and for a limited time. It appears, on the contrary, that his was a deep-laid programme and a foregone conclusion to undertake an extensive and risky planting venture, as though he was the owner of the entire estate, and for an unlimited time. Hence, he undertook the crops of 1880, 1881, 1882 and 1883, and undismayed by the losses which he encountered, he persevered in his honest intention to work the estate out of debt, for the benefit of his children and grandchildren, up to the very moment of his death. And such was his solicitude that his plan should not be defeated even by death, that in anticipation of an approaching end of his long life, he took great pains to select the present administrator as his successor, and to specially charge him with the execution of his programme. He seemed, indeed, to have entirely lost sight of his connection with the property as an administrator. His convictions on the subject are thus described by counsel for the accountant herein : "It must be borne in mind that Gen. Sparrow had himself, by talent and industry, made all this property, and, morally, was the owner of it."

It was that same misconception of the true conditions of things which has superinduced all the errors which have continued to swell the great complications which beset us on all sides in this controversy. It was manifestly the same misconception which subsequently shaped

the course of the present administrator, and, therefore, the record shows him honestly, faithfully, but erroneously, following the footsteps of his predecessor in the administration of this large estate.

Far from making any effort to lease the plantations of the succession, Gen. Sparrow actually rented adjoining lands to which he extended his hazardous agricultural enterprise, and no effort was ever made by either of the administrators to lease any one of the plantations. The only letting which was done or even tried was to laborers, known in the cotton regions as "tenants," who pay their rent in cotton or lint, and who are supplied for all their needs by the planter himself, and in this case by the administrator, by and through the plantation store hereinabove referred to. During Chaffe's administration the store has been kept and run by his overseer or manager on his own account. The current of authority in our jurisprudence is to the effect that executors and other succession representatives "cannot at the risk of the succession carry on plantation operations, and contract, in so doing, debts, so as to bind the estate."

The rule is not absolutely inflexible to the extent of annulling or defeating a debt incurred by an administrator in meeting the expenses necessary to save and harvest a crop already begun, or hanging by the root at the date of his appointment. But it is manifestly sufficient in scope to amply cover the case now under discussion. Miltenberger vs. Elam, 11 Ann. 668; Succession of Décuir, 22 Ann. 372; Miltenberger vs. Taylor, 23 Ann. 189; Carroll et al. vs. Davidson, 23 Ann. 428; Forsheim vs. Holt, 32 Ann. 133.

In the case of Carroll et al. vs. Davidson, just quoted, the Court described the very effect which would, in this case, eventually seal the fate of the heirs of Mrs. Sparrow, if the administrator were allowed to go unbridled in the planting venture, so inauspiciously inaugurated by Gen. Sparrow, when it said : "To permit an administrator, indefinitely, to carry on the plantation business and annually increase the indebtedness of the estate, would give him the power to ruin the estate irretrievably."

That utterance is characterized by counsel for Chaffe & Sons as erroneous and inconsistent with previous, as well as with subsequent, rulings of this Court on the same subject. But our researches in this case, which have been long, tedious and thorough, have led us to the same conclusions as are therein announced.

The same rule was clearly recognized and firmly applied by our immediate predecessors, the successors of the bench which rendered the decision so earnestly assailed by counsel.

In the case of Forsheim vs. Holt, 32 Ann. 133, the Court used the following language: "Now, we take it that it is no longer an open question that an executor cannot, at the risk of the succession, carry on planting operations and contract in so doing debts, so as to bind the estate; at all events, certainly not without previous authority obtained." And the opinion then proceeds to demonstrate that the question is not touched by two cases on which counsel for accountant herein place great reliance. Succession of Wederstrandt, 19 Ann. 494; Succession of Brown, 27 Ann. 331.

The case in hand is a fair illustration of the wisdom of the rule. A succession without debts was run into debt exceeding $35,000 by means of planting operations which lasted three years and a half.

The recent opinion of this Court in the case of the Succession of Myrick, 38 Ann. 611, is in vain invoked by counsel for accountant in support of their contention. The issue in that case involved the right of the heirs to claim of the administrator the value of working animals on the ground that he should have sold them and not have allowed them to die away on the plantation, and to enforce the liability of the administrator for five years' rent of the place.

The court exonerated the administrator from both claims, on the ground that he could not have sold the working animals separately from the plantation to which they were attached; and on the additional ground that, having tried without success to lease the plantation, the administrator was legally justified to cultivate it so as to save it from waste. It must also be noted that the administrator in that case did not seek to bind the succession for debts incurred in his planting operations.

Our conclusion is, therefore, that the accountant was not authorized to carry on planting operations on the account, and at the expense of the succession, and that we have, therefore, no concern with his accounts covering his operations in that line.

And we hold further that, having made no effort to lease the plantations under his administration, he is liable for the rental value of the same during the time that he cultivated them for his own account under the law. We note in this connection the contention of counsel that "there is no law authorizing or recognizing the property of a suc cession to be leased," and that they support their position by referring to two decisions of this Court. The first is the case in 35 Ann. 858, Succession of Richmond; but the authority of that case doubly conflicts with their argument. In the first place the opinion directly recognizes the authority of the administrator to lease succession prop-

erty; and in the second place the court said, in answer to a claim, that the property should have been leased at public auction : " We know of no law and we have been referred to none, which compels the administrator of a succession to lease property *at auction.*" (Italics ours.)

The second is the case of the Succession of Myrick, 38 Ann. 611—but the following quotation from it is a sufficient answer to counsel's contention : "It was his duty to have leased the plantation if he could, but we are satisfied from the testimony of the administrator and of Ed. Myrick, the tutor of the opposing heirs, that this was impossible."

As to the value of the rental of the three plantations we find the testimony very conflicting. But in consideration of the depreciated value of that kind of property and of the low prices which cotton commands on the market, we have adopted a low estimate and we conclude to fix the rent of the three plantations together at the sum of four thousand dollars per annum subject to deduction for taxes levied thereon, and to the administrator's commissions on the rental.

As to the demand for the destitution of the administrator, we find no evidence to justify that measure. It was the firm of John Chaffe & Sons and not the administrator personally who asked a respite from creditors.

And we are satisfied that the faults committed by the administrator do not amount to malfeasance, but at most to errors and honest errors of judgment. "It is well settled that the enforcement of the penalties provided for this and similar defaults of executors and administrators, is a matter within the sound discretion of the court." Congregation of St. Mary vs. Farrelly et al., 34 Ann. 533; Dickson vs. Dickson, 23 Ann. 583.

Nor is there such mismanagement in the conduct of this administrator as would justify the withdrawal of any of his sureties under the provisions of Sections 3737 and 3738 of the Revised Statutes.

In conclusion we note the apparently meritorious contention of John Chaffe & Sons, in urging the legal liability of the two heirs of age for their respective shares of the indebtedness acknowledged to be due to that firm by the present administrator, in reimbursement of their advances of money and supplies used in the cultivation of the plantations by Edward Sparrow, the previous administrator.

That liability is alleged to grow out of the written consent of these two heirs to the planting operations of their father, under which they are estopped from repudiating the consequences of the acts which they authorized and sanctioned.

On inspection, these documents which were executed in November,

1882, some time after the written acknowledgment by Edward Sparrow of the correctness of the firm's account, have the legal effect of a ratification of the father's administration and of his management of the plantations belonging to the succession.

The instruments signed respectively by Mrs. Foster and by Mrs. Ashbridge contain the following very significant declaration: "That the said estate is indebted to the commercial firm of John Chaffe & Sons for supplies furnished and advances made by them to enable the administrator to carry on the plantations. Now, therefore, we, the said heirs, declare that we hold our respective shares in the said estate liable for all just demands of the said John Chaffe & Sons incurred as stated, and for such supplies or advances as may be made hereafter to enable the administrator to cultivate and make crops on said plantations." *  *  *

It requires no argument to show that such an agreement contains both a ratification of the previous acts and an authorization in the way of the management of the succession plantations, for cultivation of the same in the future. It cannot therefore be denied that such a declaration must have created the legal obligation on these two heirs, to respond to the indebtedness thus incurred under their own authorization, in so far as their respective shares of the estate are concerned.

That obligation is not resisted by Mrs. Foster, who judicially recognizes it to its fullest extent, by means of a petition of intervention filed herein as above stated.

But it is strenuously repudiated by her co-heir Mrs. Ashbridge, who contends in substance that she was not informed of the condition of affairs at or previous to the time at which her signature was obtained, and that she signed the instruments, while she was sick in bed, without reading or taking cognizance of the same.

The tenor of her declaration shows that the intention was to give general and full power to the administrator to carry on planting operations at the expense of her share or interest in the estate, and it follows that the amount of indebtedness thus existing or already incurred, was not a condition precedent of her signature, but that it was a matter of merely secondary consideration. No more can she escape liability through her alleged ignorance of the contents and purport of the instrument before signing it. She states herself that it was sent by mail by her brother-in-law, Major Foster, at the request of her father, to her husband who presented it to her for her signature. She does not set up the slightest pretense, or even intimate that any attempt or effort was made to deceive or to misguide her in the premises. "If

45

she failed to read it, it was her own fault and plaintiffs (John Chaffe & Sons) cannot be affected by any error resulting from her own gross negligence." Allen, West & Bush vs. Whetstone et al., 35 Ann. 850. See also Allison & Co. vs. Watson, 36 Ann. 620.

Her subsequent conduct in receiving a monthly allowance of one hundred dollars from the present administrator out of the revenues of the crops made on the plantations; and her judicial demand for such an allowance after it had ceased, as a result of her attitude in this litigation, are circumstances which speak louder than words in explanation of her understanding of matters, and of her intention when she executed the agreement in question. It appears from the record that since his appointment the present administrator has also furnished the means necessary for the maintenance and for the schooling of the minors, Mary and Kate Decker, and that, as they were without a tutor from August, 1883, to the latter part of 1885, the funds were intrusted to Mrs. Foster, who had kindly taken charge of the two minors. All these proceedings were irregular and were carried on outside of the law, but they were manifestly prompted by laudable feelings and considerations of fairness and of humanity, for which the administrator should not be made to suffer if by any legal means he can obtain reimbursement.

We, therefore, deem it our duty to reserve the rights of John Chaffe & Sons and of the present administrator to enforce their respective claims against the two heirs of age, on account of the latter's liability for expenses incurred in the cultivation of the plantations of the succession, by proper proceedings in *due course of administration*, and we also reserve the rights of the administrator to demand reimbursement of all sums advanced by him to the two heirs aforesaid, as well as for similar advances made to the minors, Mary and Kate Decker. As we took occasion to state in the early portion of this opinion, our investigation of the issues presented in this case has been addressed to the rights and obligations of the succession as a legal entity; hence, our decree herein is intended and binding in that sense only, and not as finally adjusting the adverse rights and obligations of creditors and heirs *inter sese* as growing out of their respective personal actions and contracts.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and proceeding to render such a judgment as should have been rendered below: it is ordered, adjudged and decreed that the two provisional accounts of administration herein rendered and filed by Chris. Chaffe, Jr., admin-

Railroad Company vs. Frank.

istrator, and the tableau of debts charged against said succession, also presented by said administrator, be and the same are hereby, each and all, annulled, cancelled and rejected, under and subject to the rights hereinabove reserved in favor of said *administrator and of the firm of John Chaffe & Sons* touching their claims against the two heirs of age for moneys advanced and for expenses of cultivating the succession plantations and in favor of the administrator for moneys advanced for the maintenance of the minor heirs, Mary and Kate Decker. It is further ordered that Chris, Chaffe, Jr., administrator, be required to present forthwith a provisional account of administration and a tableau of debts which may be due by said succession, from which he shall exclude, as debts due by said succession, all expenses incurred in the cultivation of succession plantations, either by himself or by Edward Sparrow, former administrator of said succession, and all items of indebtedness due to John Chaffe & Sons, either by A. M. Ashbridge or by Edward Sparrow, personally.

It is further ordered that, in his account, the administrator shall enter the claim of J. M. Kennedy for the sum of forty-eight dollars, as a privileged debt; that he shall charge himself with rent for the three plantations and their appurtenances, belonging to said succession, during the whole time that he cultivated them, at the rate of four thousand dollars per annum for the whole, subject to deduction of taxes and administrator's commissions.

It is further ordered that the demand for the destitution of said Chris. Chaffe, Jr., as administrator aforesaid, the demand to compel him to furnish a new bond, and the demand of Mrs. Fanny Ashbridge for her withdrawal from his bond as administrator, be and the same are hereby rejected and dismissed, and that all costs in both courts be taxed against the succession.