## VOLUME 125

## CASES ARGUED AND DECIDED IN THE SUPREME COURT OF LOUISIANA

AT TERM BEGINNING FIRST MONDAY OF OCTOBER, 1909

(51 South. 48.)

No. 17,706.

MAXWELL–YERGER CO. v. ROGAN (P. P. WILLIAMS CO. et al., Interveners).

(Jan. 3, 1910.)

*(Syllabus by the Court.)*

1. EXECUTORS AND ADMINISTRATORS (§ 42*)—PROPERTY OF ESTATE — CROP PLANTED BY ADMINISTRATOR—"SUCCESSION."

When the idea of planting a crop on a plantation under administration is conceived by the administrator long after the harvesting of the crop that was growing when the decedent died, and the crop is planted and harvested later still without authority from the court, the creditors, or the minor heirs (who could give no consent), neither such crop nor the obligations incurred in making it can be said to fall within the definition (Civ. Code, art. 872) "succession signifies also the estates, rights and charges which a person leaves after his death," nor is such crop a thing that "accrues" to the succession (Civ. Code, art. 873). In fact, its only connection with the succession may be found in the circumstance that the administrator, acting without authority, and hence, not representing the succession, has used the land, live stock, and ~~im~~ ~~~~ the succession for its production.

~~[~~For other cases, see Executors ~~and Administ~~rators, Cent. Dig. § 284; Dec.

For other definitions, see Words and Phrases, vol. 7, pp. 6745–6746.]

125 LA.—1

2. EXECUTORS AND ADMINISTRATORS (§ 93*)—OBLIGATIONS INCURRED BY ADMINISTRATOR WITHOUT AUTHORITY — LIABILITY OF SUCCESSION.

Where an administrator cultivates a plantation without authority, he cannot bind the succession, but may render himself personally liable for the obligations thereby incurred. On the other hand, the person who furnishes the money and supplies used in the production of a particular crop is entitled to enforce his privilege on the crop, and the administrator, who has acted as such, in obtaining the money and supplies, may stand in judgment in a proceeding instituted for that purpose, though no general judgment may be rendered against him as representing the succession.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 407, 408; Dec. Dig. § 93.*]

3. EXECUTORS AND ADMINISTRATORS (§ 429*)—SEQUESTRATION (§ 5*)—SUIT AGAINST SUCCESSION—ACTION AGAINST ADMINISTRATOR.

A claim against a succession may be asserted in a direct action against the administrator, and a plaintiff, in such case, on proper showing, may obtain a writ of sequestration as a conservatory measure for the protection of his rights, pending the litigation, though it does not follow that the judgment obtained by him can be executed otherwise than through the administration and in concurso with other creditors.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 1677; Dec. Dig. § 429;* Sequestration, Cent. Dig. § 4; Dec. Dig. § 5.*]

2

4. CROP—PLEDGE—CROPS INCLUDED — PRIVILEGE.

Where a crop pledge is given and recorded, and cotton and agricultural crops are therein mentioned, but cotton seed is not, and there is conflicting testimony as to verbal agreements, the court will be controlled by the law, which gives a privilege on the "crop." Where the intention is to release part of a crop from the privilege so given, it should be expressed in the contract, and not left to inference or to conflicting statements.

[Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 117.*]

5. CROP—PLEDGE—PRIORITIES.

The recorded pledge of the furnisher of money and supplies primes all unrecorded and subsequently recorded privileges of such furnishers. Decision in Flower & King v. Skipwith, 45 La. Ann. 895, 13 South. 152, overruled. And the privilege of the overseer, for his salary primes that resulting from the recording of such pledge; all as provided by the Act No. 89 of 1886.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 231, 232, 241; Dec. Dig. §§ 138, 144.*]

Appeal from Ninth Judicial District Court, Parish of Madison; F. X. Ransdell, Judge.

Action by the Maxwell-Yerger Company against Irby L. Rogan, administrator of L. W. Rogan, and others, interveners. Judgment for plaintiff, and certain interveners appeal. Reversed in part.

David M. Evans, for appellant Irby L. Rogan. A. L. Slack, for appellant W. H. Miller Grocery Co. John B. Stone, for appellant Geo. T. Amos. Snyder & Gilfoil (M. M. Boatner, of counsel), for appellee.

Statement of the Case.

MONROE, J. L. W. Rogan, who owned Atherton plantation, in the parish of Madison, died in June, 1907, leaving a widow in community and three major and two minor children, and no other estate than the plantation mentioned, which was heavily mortgaged. In July following his major son, Irby, who had been managing the plantation for several years, applied for letters of administration, which were granted, and his mother was confirmed as natural tutrix of the minors, of whom he was appointed undertutor. His father had obtained part of the money and supplies used in making the crop of 1907, and he (the administrator) had obtained part, and the administrator had also obtained some advances and supplies for the putting in of the crop of 1908, but no definite arrangement had been made for "carrying" the plantation during the last-mentioned crop year. In the latter part of March, therefore (1908), Mrs. Rogan, in her capacity as widow in community and tutrix, presented to the district court a petition, in which she alleged that she and the heirs owned the plantation; that it was in a high state of cultivation and well tenanted; that they all desired to continue it in cultivation; and that, in order to preserve the property, support the family, pay the debts, and obtain the advances and supplies required for the making and harvesting of a crop, it would be necessary to borrow money, and for that purpose to mortgage the interests of the minors. Wherefore she prayed that a family meeting be convened, and the family meeting was convened, and, having recommended that the interests of the minors be mortgaged for the purpose stated, the recommendation was approved by judgment of the court. It was probably found, however, that the widow and tutrix had no capacity or status to handle the matter in the then situation, and it was taken up by the administrator, who endeavored to make a contract for advances and supplies first with one and then with another of the parties with whom he had been dealing, and with others besides, and, being unsuccessful, he finally applied to Maxwell-Yerger Company (plaintiff) herein, which concern had already furnished certain money and supplies with the expectation of being reimbursed from funds to be obtained from whomsoever should take the contract for the year, but which itself took that contract, that is to say, entered into a pledge contract, bearing date July 1, 1908, and re-

corded on the same day, which reads in part as follows, to wit:

"Irby L. Rogan * * * declared that he is the administrator of the succession of L. W. Rogan, deceased, and one of the heirs * * *; that, in his capacity of administrator, * * * he is planting the Atherton plantation, belonging to said succession, during the current year, and that, in order to enable him to plant said property, he has contracted an indebtedness unto Maxwell-Yerger Company, a corporation, * * * for moneys and necessary supplies, advanced to him during the current year, to enable him to make and gather crops of agriculture on said Atherton plantation, to the amount of $2,300; that said debt is evidenced by two promissory notes; * * * one, for the sum of $1,000, and the other, for the sum of $1,300, falling due November 15, 1908; * * * that, in order to secure the payment of said notes and any open account which said Maxwell-Yerger Co. may have against him, for any amount furnished him during the current crop season, he does grant unto said Maxwell-Yerger Co. a lien and privilege accorded by law to the furnisher of plantation supplies and also a pawn and pledge upon and against all the cotton planted, grown, or gathered upon said plantation during the crop season of the current year, to the fullest extent allowed by the laws of the state of Louisiana, and authorizes said Maxwell-Yerger Co. to discount said notes and place the proceeds to his credit upon its books and to advance more than said sum should the same become necessary, and authorizes said corporation to credit any payments which he shall make to them upon any open account in preference to crediting the same upon said notes, at its option. Appearer further binds himself to ship all the cotton raised on said plantation to market for sale as rapidly as gathered, to be shipped, to the account of Maxwell-Yerger Co., to some cotton market and proceeds to be credited by the merchant selling same to the account of Maxwell-Yerger Co., until all indebtedness under this contract shall be extinguished," etc.

Under this contract, advances and supplies were made and furnished by plaintiff to the amount (including that advanced prior to July 1st) of $3,740, and the administrator had delivered to plaintiff 54 bales of cotton (being all that had been ginned), when on December 14, 1908, plaintiff instituted this suit, alleging the contract in question and the indebtedness thereunder, further alleging that it feared that the succession and the administrator "will conceal, part with, and dispose of, said crops, during the pendency of this suit and deprive petitioner of its rights of lien, pawn and pledge," and praying for a writ of sequestration (which was issued, and under which there were seized apparently some 12 bales of cotton and 6 tons of cotton seed) and for judgment against the administrator, and the succession for $3,740, with interest, etc., "subject to a credit of the proceeds of said 54 bales of cotton, when sold, to be applied, first, to the payment of the balance due on the open account, $1,440, * * * and the remainder of the said forty five bales of cotton [it having been assumed that forty-five bales would be seized] to be credited on said notes, and that petitioner's lien and privilege be recognized and made executory against said property and that the same be sold to pay petitioner's demand."

P. P. Williams & Co. intervened, claiming to be creditors of the succession for advances made to the administrator partly for the purposes of the crop of 1907 and partly for that of 1908, and opposing the method of procedure adopted by plaintiff, but, as they have perfected no appeal, their pretensions need not be further considered.

W. H. Miller Grocery Company intervened, claiming to be creditors of the succession in the sum of $723.92 for plantation supplies furnished the administrator as per an account annexed to its petition, which shows that the supplies were furnished between December 24, 1907, and May 25, 1908. Intervener alleges that plaintiff has no superior privilege on the cotton sequestered or upon the 54 bales that were delivered to it, which should be returned to the succession, to be administered in concurso; that the writ of sequestration issued in violation of law; and that the whole proceeding should be relegated to the probate side of the court, and the proceeds of all the cotton there distributed among the privileged creditors.

G. T. Amos intervened, alleging that the succession is indebted to him in the sum of $315 for services as overseer on the Atherton

plantation, under the employment of the administrator, from April 1, to December 31, 1908, and that he has a superior lien on the crop of that year for the amount so due him. He alleges that plaintiff has seized 12 bales of cotton and 6 tons of cotton seed, which have been bonded by the administrator, and that the seizure was illegal and should be quashed, that the administrator was without authority to execute the notes sued on by plaintiff or to create any lien, privilege, pawn, or pledge affecting the crop of 1908, but that, if plaintiff is entitled to any such privilege, it is inferior to that of intervener, and that the cotton, the warehouse receipts for which were delivered to plaintiff as collateral security, should be restored to the succession, and subjected, with the rest of the crop of 1908, to his claim, and he prays for judgment accordingly.

The administrator excepted on the ground that he cannot be proceeded against by direct action, that plaintiff's remedy is on the probate side of the court, after having its claim recognized, and that the writ of sequestration will not lie against the succession; and he moved to dissolve the writ on the ground that the allegations relied on for its obtention are untrue. He then (all exceptions and motions having been, by consent, referred to the merits) answered that, acting in the interest of the succession, he in his official capacity cultivated the plantation for the purposes of the crop of 1908; that, in so doing, he obtained advances and supplies for which the succession became indebted "to sundry persons as follows, to wit: To the plaintiff * * *; P. P. Williams Company; the Miller Grocery Company; G. T. Amos, the latter being for services as overseer; to the Tallulah Hardware Company, not represented in this suit, but also having a claim, part of which is for necessary plantation supplies advanced; and the Mississippi Lumber Company * * * for material furnished for the use of said plantation. Shows that there is available for the payment of the indebtedness aforesaid only the crop of said plantation for said year; that of said crop ——— tons of cotton seed were sold by respondent and the proceeds * * * were used by respondent in the payment of the indebtedness of said succession for necessary advances on said crop and for taxes for the current year 1909; that the entire crop * * * excepting said * * * seed, * * * consists of 54 bales of cotton, stored by respondent, in his said capacity, in the cotton warehouse, at Tallulah, La., and the receipts for which were delivered to and are held by the plaintiff, and 12 bales of cotton and 6 tons of seed, which were seized and released from seizure on bond; * * * that said 12 bales of cotton and 6 tons of seed are also stored by him, in his said capacity, * * * and the receipts for the same are now held by * * * Craig, to secure him against liability as surety on said bond."

He alleges that he was getting the business in condition preparatory to filing his first annual account, when he was interfered with by this suit and seizure—to the great injury of the succession—and he prays that plaintiff's demand be rejected; that the 54 bales of cotton and the 12 bales and the 6 tons of seed be decreed to belong to the succession, and that this proceeding be transferred to the probate side of the court, and the claims against the succession there ranked in concurso. There were some other pleadings which need not be particularly set forth. Prior to the rendition of the judgment, the plantation was sold under foreclosure of mortgage and adjudicated to the seizing creditor, and it appears from the evidence adduced that there is little or no property to which the plaintiff herein and the interveners can look for the payment of their claims, save that which is the subject of the present controversy. The judgment of the district court

was in favor of plaintiff, and the defendant the W. H. Miller Grocery Company and G. T. Amos, interveners, prosecute the appeal.

### Opinion.

When the decedent, L. W. Rogan, died (June, 1907), the seeds of the crop of 1908 had not been planted, nor were they planted until some 9 or 10 months afterwards, and the crop itself did not come into existence until some time later still. Neither the decedent's heirs nor his creditors could therefore have had any legal rights with respect to that crop at the time of his death; and, as the idea of planting it was wholly conceived and carried out after that event, and necessarily by other persons, it follows that neither the crop nor the obligations incurred in making it can be said to constitute any part of his succession within the meaning of the definition (Civ. Code, art. 872) "succession signifies, also, the estates, rights and charges which a person leaves after his death," etc. Nor is the crop anything that "accrued" to the succession within the meaning of Civ. Code, art. 873, but, having been, as we have seen, wholly conceived and produced long after the succession had been opened, it has no other connection therewith than that the administrator, professing to act in that capacity, though without authority of law or order of court, made use of the land, live stock, and implements of the succession for its production.

"The rule is well established [our predecessors have said] that neither executors nor administrators have the power to create liabilities against the estates they represent." Succession of Decuir, 22 La. Ann. 371; Miltenberger v. Taylor, Ex'r, 23 La. Ann. 188; Carroll Hoy & Co. v. Davidson, 23 La. Ann. 428; Succession of Mansion, 34 La. Ann. 1247.

In the Matter of the Succession of Wederstrandt, 19 La. Ann. 494, it was held that where at the death of the testator a crop had been planted the executor might, unless the heirs or creditors objected, cultivate and harvest it, and that the expense incurred in so doing should be allowed in the settlement of his accounts, and the doctrine stated has been recognized in Florsheim Bros. v. Holt, Ex'r, 32 La. Ann. 133, Succession of Worley, 40 La. Ann. 622, 4 South. 570, and Succession of Sparrow, 39 La. Ann. 702, 2 South. 501. In the case last mentioned the court said:

"The rule is not absolutely inflexible, to the extent of annulling or defeating a debt incurred by an administrator in meeting the expenses necessary to save and harvest a crop, already begun or hanging by the roots."

But the court also quoted from a case previously decided, and applied to the case to be decided, the following language, to wit:

"To permit an administrator indefinitely to carry on the plantation business, and, annually, increase the indebtedness of the estate, would give him the power to ruin the estate irretrievably." 39 La. Ann. 702, 2 South. 501.

In the instant case the administrator neither applied for nor obtained any authority from the court in the premises, but, apparently with the concurrence of the widow in community and natural tutrix, conceived the idea of continuing the cultivation of the plantation indefinitely. There is no evidence of the concurrence of the other major heirs, and the minors, of course, were in no way bound, nor, so far as we can see, were the creditors of the succession. In some such cases executors and administrators have been sued and condemned personally; in others, where obligations, representing debts of the de cujus, were sued on, the distinction has been drawn between such obligations and those given for debts contracted after the death of the de cujus, and it has been held, as to the former, that they were to be regarded merely as "acknowledgments," which an executor or an administrator has the right to make, and, as to the latter, that the officers giving them were bound personally. Russell & Barstow v. Cash et al., 2 La. 185; Livingston v. Gaussen, Adm'x, 21 La. Ann. 286, 99 Am. Dec. 731;

Carroll Hoy & Co. v. Davidson, 23 La. Ann. 429, 430; Succession of Mansion, 34 La. Ann. 1248. In still other cases, where such officers have exceeded their powers in cultivating plantations, they have been allowed in the settlement of their accounts the actual expenses incurred by them in the making of particular crops, though, so far as we have observed, not to an extent exceeding the amounts yielded by such crops. Succession of Worley, 40 La. Ann. 626, 4 South. 570; Succession of Myrick, 38 La. Ann. 613. We find no case in which the person who has advanced the money and furnished the supplies necessary to and used for the making of a particular crop has been denied his recourse against, and privilege on, the crop itself. In the instant case defendant, assuming that he had power to act as administrator, dealt with plaintiff in that capacity, and plaintiff dealt with him upon the same assumption. Defendant did not have such power quoad the dealings in questions, and plaintiff is not entitled to any judgment against him for which the succession administered by him will be bound, save in so far as may be necessary to enforce its (plaintiff's) rights with respect to the crop, which was produced with its money and supplies, but for that purpose and to that extent we think defendant is competent to stand in judgment. The question then is: What are plaintiff's rights?

Even if the claim under consideration were for a debt due by the succession, it could be asserted, as it is, against the administrator by direct action (Code Prac. art. 986; Anderson's Adm'r v. Birdsall, 19 La. 441; Succession of Jacobs, 5 Rob. 270; Succession of McCalop, 10 La. Ann. 224), though it would not follow that the judgment could be executed otherwise than through the administration and in concurso with other creditors of the succession. Code Prac. arts. 987, 1053, et seq. And plaintiff would have the right in such case to the writ of sequestration as a conservatory measure for the protection of his rights pending the litigation. Otherwise an administrator could dispose of property subject to privilege or pledge, and the creditors would be without remedy. Daugherty v. Executor of Vance, 30 La. Ann. 1246. It is said, however (by defendant), that the sworn allegations (that "petitioner fears that said succession and said Irby L. Rogan, administrator, will conceal, part with and dispose of said crops, during the pendency of this suit, and deprive petitioner of its rights, lien, pawn, and pledge," etc.) were untrue, and that the writ should be dissolved for that reason. It appears from the evidence that after plaintiff's advances well exceeded the amount specified in the act of pledge and about the time, or perhaps after, defendant had delivered the 54 bales of cotton, defendant sold to a third person 6 tons of cotton seed (part of the crop raised by him), and declined, upon plaintiff's request, to turn the money over to it, and it also appears that about that time Amos shipped 5 bales of cotton for his own account by rail to some third person, which plaintiff took to be part of the crop from Atherton plantation. As a matter of fact, it was cotton that Amos had acquired elsewhere, but it seems likely that, as plaintiff thought it was part of the Atherton crop, that belief was mainly its reason for the issuance of the sequestration. We think, however, that under the law, and under the contract between the parties, the cotton seed was as much subject to plaintiff's pledge as the cotton. It was part of the crop, and the law gives the privilege and right of pledge on the crop. It is true that the contract, after reciting that defendant "has contracted an indebtedness * * * to enable him to make and gather crops of agriculture," etc., proceeds to declare that defendant "does grant unto said Maxwell-Yerger Co. a lien and privilege * * * and also a pawn and pledge upon * * * all

the cotton planted and grown," etc., and that cotton seed is not especially mentioned. And the defendant testifies that it was especially excluded from the pledge by verbal agreement.

Plaintiff's representative, however, testifies to the contrary, and there is further testimony on plaintiff's behalf to the effect that, after the advances had exceeded the amount represented by the notes, plaintiff paid a note of defendant's given for advances for the crop of 1908 and held by a third person, who was threatening suit, and that the payment was made with the understanding that the proceeds of the cotton seed were to be accounted for to it. Defendant denies that there was any such understanding. Neither factors nor others are presumed to waive their rights, and, where it is the purpose to exclude from the operation of the law which gives a privilege for advances and supplies a portion of the crop upon which such privilege bears, it should be so stated in the contract, and not left to inference or to be decided on conflicting testimony. Under the circumstances as disclosed, therefore, we shall have to hold, as did the trial judge, that plaintiff's lien and right of pledge bears upon the cotton seed, and that defendant's refusal to account for it was sufficient justification for the issuance of the sequestration.

That plaintiff advanced money and supplies to the amount claimed in the petition, and that same were necessary, and were actually used, for the production of the cotton and seed in question, is not denied by defendant, nor seriously disputed by the interveners. It is however necessary to consider the law bearing upon the respective rights of plaintiff and interveners.

Civ. Code, art. 3217, gives a privilege "on the crops of the year" to the overseer for his salary, and to the furnisher of the money and supplies used in its production. Act No. 66 of 1874, p. 114, provides:

"Section 1. * * * That, in addition to the privilege now conferred by law, any planter or farmer may pledge or pawn his growing crop * * * for advances, in money, goods and necessary supplies, that he may require for the production of the same, by entering into a written agreement to pledge same and having same recorded in the office of the recorder of mortgages of the parish where said * * * product is produced, which recorded contract shall give and confer on the merchant or other person advancing money, goods and necessary supplies for the production of the said agricultural product, a right of pledge upon the said crop, the same as if the said crop had been in the possession of the pledgee: Provided that the right of pledge thus conferred shall be subordinate to that of the claim of the laborer for wages and for the rent of the land on which the crop was produced."

Section 2 of the act (as amended by Act No. 44 of 1882) provides that, when the product has been consigned to the furnisher of money or supplies by ship or rail, it shall be pledged to the consignee thereof "to secure the payment of said advances from the time the bill of lading thereof shall be put in the mail, or put in the possession of the carrier for transmission to the consignee, and the right of pledge shall be perfect, with the right of sale of said property, which shall be fully vested in said consignee with the right to appropriate the proceeds of sale to the payment of the amount due for such advances as may have been made thereon," and there follows a proviso in favor of the laborer and the landlord. Act No. 89 of 1886 provides as follows:

"Section 1. * * * That all privileges and pledges on crops, granted by existing laws of this state, shall be ranked in the following order of preference, viz.:

"First. Privilege of the laborer.

"Second. Privilege of the lessor.

"Third. Privilege of the overseer.

"Fourth. Pledges under section 1, of act No. 66 of 1874, *in order of recordation*. (Italics by the writer.)

"Fifth. Privilege of furnishers of supplies and of money and of the physician."

The language of this, the latest, statute, is plain. The furnisher of supplies is entitled to a privilege under Civ. Code, art. 3217. Act of 1874, § 1, provides that, "in ad-

dition to the privilege now conferred by law," he shall be entitled to a pledge by doing certain things, to wit, by entering into a written contract of pledge and having the contract recorded. If any doubt was created as to the effect of that provision by section 2 of the act, as amended by the act of 1882, it was resolved by the act of 1886, which, as we see, "provides that" pledges, under section 1 of Act No. 66 of 1874, "in the order of recordation" shall rank fourth; that is to say, they shall all rank after the privileges of the laborer, the lessor, and the overseer, and before the privileges of the furnisher of supplies, and the physician, and, with reference to each other, "in the order of recordation."

The act in question was somewhat differently interpreted in the case of Flower & King v. Skipwith, 45 La. Ann. 895, 13 South. 152, but the soundness of the conclusion reached in that case was questioned in the case of Southern Grocer Co. v. Adams, 112 La. 60, 36 South. 226, and we now feel constrained to overrule it. The recorded pledge of the furnisher of money and supplies primes all unrecorded and all subsequently recorded privileges of such furnishers. It follows that, as plaintiff is the only furnisher of money and supplies before the court whose pledge is recorded, its claim must be given the first rank in that class. The laborers appear to have been paid with the money furnished by plaintiff, and there is no lessor. The only person therefore whose claim apparently takes precedence of that of plaintiff is the intervener, Amos, for $315, for nine months' salary, at $35 per month, as overseer. It appears that the witness had been reared on his father's cotton plantation (in the parish of Franklin), and had there acquired some little knowledge of the business of planting, that he went to the parish of Madison in 1906, and was employed as a bookkeeper and clerk until the latter part of March, 1908, when, according to his testimony, he was employed by defendant as bookkeeper and assistant overseer on the Atherton plantation, and served in that capacity from say April 1, to December 31, 1908. The defendant, corroborating the intervener, says:

"He was to help me manage the place and keep the books last year from the time he started, and I was to give him $35 per month and board."

Defendant also testifies that by employing intervener he was enabled to dispense with a negro foreman. Plaintiff introduced some testimony to show that intervener had applied for a position, but it appears to us that the applications were made before he went to Atherton, but, in any event, he may well have wished to find a better position. It is said, and the learned judge seems to have adopted that view, that the intervener was inexperienced, and that it was unlikely that defendant, situated as he was, would have employed an overseer when he had been managing the plantation without one for several years and when he had a younger brother living on the place. During the several years before, however, defendant's father had been living, and was the responsible head of the establishment to whom the foreman or laborers could appeal when defendant was called away. The younger brother was a person whom defendant says he could not control or rely on. Whether the intervener was competent or not was a question for defendant to determine. He testifies that he did the work for which he was employed, and we must accept his, and intervener's, direct testimony as controlling the inference drawn by the witnesses for plaintiff. Neither the defendant nor the intervener, however, undertake to say what proportion of the salary agreed upon was to be paid for bookkeeping and what proportion for overseeing, and, though we do so with some hesitation, we fix the amount to which he is entitled as assist-

ant overseer at $180, being $20 per month for the nine months beginning April 1, 1908.

When the judgment was rendered in the district court only 52 of the 54 bales of cotton which had been delivered to plaintiff had been sold, and the cotton and seed which had been seized had been bonded, but, as we understand it, remained in storage. It was therefore impossible for the judge a quo to know the exact amount that would be realized from the property which was subject to plaintiff's pledge, and there was judgment against the defendant as administrator for the full amount claimed ($3,740) and interest, "with a credit on the whole amount of $2,611.98, the proceeds of 52 bales of cotton, and a further credit of the proceeds of 2 bales of cotton, in the hands of plaintiff, to be applied thereon, decreeing that the lien and privilege and pledge of the plaintiff on the crop, given by the defendant, administrator, be recognized and sustained; that the writ of sequestration sued out be sustained and the cotton, etc., seized thereunder be sold and the proceeds applied to the payment of the judgment; * * * that the interventions be dismissed, interveners to pay the costs incident thereto, costs of main demand to be paid by defendant." For the reasons stated, the judgment appealed from will have to be amended in part and reversed in part.

It is therefore ordered, adjudged, and decreed that, in so far as the judgment appealed from condemns the defendant, administrator, save as incidental to the recognition and enforcement of the right of privilege and pledge asserted against the crop produced on Atherton plantation in 1908, and in so far as it rejects the demand of the intervener, G. T. Amos, up to the sum of $180, said judgment be avoided and reversed; that, in so far as it sustains the writ of sequestration, orders the sale of the cotton and seed seized thereunder, recognizes the privilege and pledge asserted by plaintiff on the said crop (save as hereinafter stated), authorizes plaintiff to credit its claim with the proceeds of the 54 bales of cotton (part sold and part unsold) delivered to it by defendant, rejects the demand of the W. H. Miller Grocery Company, and rejects the demand, in excess of $180, of the intervener G. T. Amos, said judgment be affirmed. It is further adjudged and decreed that there be judgment in favor of the intervener G. T. Amos, decreeing him entitled to be paid from the proceeds of the cotton and seed seized by the sheriff by preference over all other claimants the sum of $180, together with the costs incurred by him in the district court, and that there be judgment in favor of plaintiff decreeing it entitled to be paid the balance of such proceeds, or so much thereof as may be necessary to satisfy its claim, including the costs incurred by it in the district court. It is further decreed that the costs of the appeal be paid by plaintiff and the intervener W. H. Miller Grocery Company in equal proportions.

PROVOSTY, J., takes no part.